May it please the court, excuse me, good morning, your honors. Good morning. My name is Scott Allen. I represent the appellants. As you know from our briefs, the appellants seek to have a federal environmental statute, CERCLA, applied extraterritorially to two former U.S. bases in the Philippines, Clark Air Base and Subic Bay Naval Base. CERCLA is made applicable to current and former U.S. bases outside the United States by the provisions of the Defense Environmental Restoration Program statute. In DERP, Congress used very broad language to express its clear intent that CERCLA apply extraterritorially. In Section 2701C of DERP, the Secretary of Defense is required to comply with CERCLA at current and former bases that are or were owned by, leased to, or otherwise possessed by the United States. Have you gotten any case law that supports your position? Yes. We've cited the case of the United States versus Poland in our brief. And in that case, it was the United States Air Force Court of Criminal Appeals. Although it was looking at a case that involved language in a child pornography statute, the language was very similar to what was used in the DERP statute. So the answer would be regarding CERCLA, you don't have anything? Regarding CERCLA, no. This would be a case of first impression, as the district court acknowledged. Are you familiar with a recent case, district court case called ARC, called GB, U.S. Department of the Air Force? That's this case. Pardon? That's this case on appeal, Your Honor. No, I'm sorry. It's not. I'm sorry. It's a case. You're referring to the Washington case called Pocutus? It's an unpublished decision? Yes. Yes, I'm familiar with it. It held that CERCLA applies extraterritorially where there is transboundary within the United States. The United States. Yes. And there's pretty strong language in that case indicating that it's limited to damage within the continental borders of this country. Well, we have a different situation here. We're talking about military bases, and that makes the provisions of the Defense Environmental Restoration Program statute are what govern. And in Section 2701 of the DERP statute, Congress used this very broad language, owned by, leased to, or otherwise possessed by the United States. That language is very similar to what the Air Force Court of Criminal Appeals held to have extraterritorial intent. Let's assume that we agree with your statutory interpretation of CERCLA, but now we're post-1992. Say pre-1992, say you were making this argument, we agree with your statutory interpretation. There could be a couple of ways that it could happen. It could happen on the base, and a citizen could be claiming it, or say someone in the Philippines could be claiming it on the base. Or it could, the base, whatever happened on the base could go into the surrounding area, and there could be someone there, either an American or a Philippine, claiming it. But now, post-1992, we're gone. All right. And so how do you state a cause of action when we're no longer there? So it's not, it doesn't, you know, if we take your statutory interpretation that it covers territories of the United States, well, it's no longer a territory of the United States. Well, Your Honors, Judge Callahan, if you take a look at the DERP statute, it does two things with respect to CERCLA. It expands CERCLA both in a temporal sense as well as a geographic sense. See, DERP has, Section 2701C1 has two subsections. The first deals with current bases that are currently owned by, leased to, or otherwise possessed by the United States. Okay, which is not the case in our facts. That's not the case. I certainly agree with you. Subsection B, however, refers to facilities that were owned by, leased to, or otherwise possessed by the United States at the time the pollution was created. And that's precisely what we're talking about here, that Section 2701C, as it applies to former bases, is understood by the military to be, to incorporate what are called formerly used defense sites or FUDs. The language, it clearly uses the past tense, which CERCLA itself does not. So we have to, I mean, so for you to prevail, we have to, we both have to, we have to temporarily and geographically extend, as you would say? Yes. Because our plaintiffs are not citizens, right? That's correct. And we don't own, and the property that you're talking about isn't owned by the United States at this point, isn't part of the United States. Because at the time the pollution was created, which is what the DERP statute says, it applies when the property was possessed by the United States at the time the pollution was created. All right. Now, but but to. But for you to prevail in this case, you have to you have to go one step further. Right. And you have to show that this this section, subsection C1B was intended to apply extraterritorially. Yes. And what's your case on that? Well, our case. Well, our argument is is set forth in our brief that the plain language that's owned by, at least two or otherwise possessed by the United States expresses Congress's clear intent there. And that's why we cited that United States versus Poland case. Language very similar to that in the child pornography statute was held to apply to Clark Air Base in Poland. And I think it's important to note that my colleagues on the other side of this case don't do not have not attempted to argue that Poland was wrongly decided. And in Poland, the Air Force Court of Criminal Appeals said that language similar to that clearly expressed a congressional intent to have the statute apply at Clark Air Base outside the United States. And we respectfully submit that if if the Poland case was correct and the defense in this case hasn't suggested otherwise, that this case should be held in favor of the appellants. Now, there are other provisions in DERP, in particular the Section 2710 of the statute, which requires the Secretary of Defense to conduct an inventory of defense sites that contain unexploded ordinance. And these defense sites in Section 2710 are defined with exactly the same language as the FUDS program in Section 2701 as facilities that are owned by, leased to, or otherwise possessed by the United States. But Congress in 2710 went on to say that the unexploded ordinance inventory does not apply to locations outside the United States. And it's our argument, as expressed in our brief, that the failure to include an exemption in 2701 for locations outside the United States showed that Congress intended that provision to apply extraterritorially. Otherwise, the exemption in Section 2710 really becomes meaningless. Now, let me ask another question. Maybe this is just a general question of international law. But assuming your reading of the statute is correct and Congress had the intent to apply it extraterritorially, how could it be applied to these former Philippine bases when full sovereignty, control, and possession is reverted to the Philippines and there's no way to apply American law there? Well, first of all, I think I recognize that there would be, for lack of a better term, diplomatic issues that would need to be addressed. It seems that you're asking us to go where courts shouldn't go. You know, I mean, why isn't this a separation of, you know, what, I mean, essentially you're asking us, you know, I mean, the argument would be made you're asking us to do something that this branch of government can't do. Well, I think that the diplomatic issues that may be raised are certainly things that could be raised as, for lack of a better term, as a futility argument or that type of thing in the district court. Well, no, what I'm getting at is the same concern Judge Collin expressed maybe more articulately, but a district court couldn't enter a judgment against the government saying, all right, you know, in the circle you have to go into Clark and clean it up. I mean, there's no way a district court could do that, right? Well, under the language of the statute, well, I think under the Aramco decision, Congress clearly has the ability to legislate extraterritorially. What I'm talking about, you know, getting back to what I said earlier, Subic and Clark are totally under the control of the Philippine government now. I mean, it's up to them to decide what's to be done on that territory. Right. There's no way that U.S. court could tell. In effect, you know, the Philippine government, you know, you have to clean this up under CERCLA. The district court would be issuing injunctive relief. And I understand that there may be diplomatic issues raised. And that's an issue that the United States, the military could come back to if the Philippines government objects. But if there are diplomatic issues, isn't that a matter for the executive branch? Well, no. As far as this court and the district court is concerned, it's a matter of applying the law that was enacted by Congress and signed by the President. Did Congress's statute express an intent to have the statute apply extraterritorially? Now, we've also made the argument that the ‑‑ Where is the evidence that Congress intended for CERCLA to afford rights to foreign claimants? It's like ten years after the United States relinquished control. Where do we look for that? Well ‑‑ I mean, because that's essentially what you're asking us to do. Well, I think that the statutory analysis that I've suggested to you, the plain language of the DERP statute, which makes CERCLA applicable to bases that are or were under the United States' control, expresses an intent to have the statute apply extraterritorially to both current and former military bases. And so that's where we would find the intent, Your Honor. I would say that CERCLA's definition of the term person certainly doesn't preclude a finding that my clients, the Philippine residents, are persons. I think that was a point made in the unpublished decision in the Picudis case, that the term ‑‑ I think it was a corporation, a Canadian corporation being sued there, and the district court in that case said that the term is used generically and certainly would not preclude a finding that a person or a corporation is someone outside the United States. Now, we've also made the argument that international law, specifically the principle of nondiscrimination against foreign nationals, requires ‑‑ Well, you invoked the Charming Betsy, I guess, canon. Yes. With regard to your international law argument, has any court invoked the Charming Betsy canon of statutory construction against the United States in the suit where the United States was a party? Not that I'm aware of, Your Honor. And I recognize that the Charming Betsy provision, as the defense side has noted in this court in its briefs, that the Charming Betsy principle is typically applied to limit extraterritorial intent as opposed to expand extraterritorial intent. Our purpose in citing that principle was simply to indicate that we believe CERCLA should not be interpreted in such a way as to violate international law. And here I think we have a case of first impression where we are saying that the refusal to give Philippine residents the right to invoke United States domestic law as a remedy for this pollution would violate the principle of nondiscrimination against foreign nationals as set forth in Rule 6022 of the restatement. At bottom, what we are really arguing under the international law aspect of our argument is that in a case where the refusal to give Philippine nationals the right to seek redress under international law, that the presumption against extraterritoriality should not apply or at the very least should be relaxed to some extent to allow foreign nationals to seek redress for pollution that the United States created during the time that it exercised jurisdiction over these bases. We think that the adoption of a principle like this is in the interest of United States citizens. A person in northern Washington State, for example, who may be injured by transboundary pollution from Canada should have the ability under international law to go to Canadian courts to seek redress. And I think it's in the interest of the United States not to have United States citizens discriminated against by foreign courts if they seek a remedy there merely because of the fact that the injury occurred in the United States rather than in Canada. So your argument here is basically if we go where no court has gone before, it would be to the benefit of our citizens because then other countries would treat us better? Yes. Okay.  I think it's far less likely that other courts would treat our citizens similarly in their courts. I see I have four minutes left. I'll reserve it. You want to reserve that? Okay. Thank you. Good morning. My name is Todd Kim from the Department of Justice. I'm here for the federal appellees. Let me just emphasize a few of the themes that have already come out in this argument. First, as has been conceded, there is no case on point here. We know of no decision supporting the theory presented by the plaintiffs here, a theory that we submit the district court properly rejected. Second, as the colloquy also indicated, there's a significant difficulty here in determining what the remedy would be, how a court would enforce it, and whether this would be a political question. I would emphasize this is relevant not only to these particular doctrines I just mentioned, but also to the basic issue here of what did Congress intend. Is it plausible to ascribe to Congress the intent to allow plaintiffs in a situation like this to invoke these domestic environmental statutes to require federal agencies to take actions? How do you distinguish the statute here from the Pullen case, which seems to be the case most closely on point? Many different ways, Your Honor. First of all, I think if you look at the particular statutory provision they cite, 10 U.S.C. 2701 sub c, it doesn't impose any obligation in the first instance. That provision indicates who will be responsible for particular response actions if one is otherwise required. It doesn't say anywhere CERCLA applies abroad. Far from it. It says the Secretary of Defense is responsible for all response actions at DOD facilities. It makes perfect sense. There's no reason why the word all would be in there in the first place if it wasn't talking about who would be responsible for particular actions, not whether actions are required in the first place. Getting beyond that, if we accepted their interpretation in the first instance of what this statutory provision is about, then we ask what was Pullen about? Pullen was about a very different kind of thing. As was indicated by a plaintiff's counsel, it was about the regulation of sexual misconduct. This Court said in the Corey case, when you're dealing with a statute of that sort, it implicates concerns that are not inherently domestic. Corey similarly indicated that with regard to a statute that regulated sexual abuse. And there the Court was considering whether the statute would apply to service members at foreign military bases. This case, by contrast, is talking about domestic environmental statutes. That, unlike the Corey situation, the Pullen situation, involves concerns that are inherently domestic. If the Pullen case could be read to support the plaintiff's argument here, we would submit it's wrong. Would it be a harder question for you if this had happened before 1992? I think it might be a harder question in terms of the atmospherics. I don't know if it would be a harder question actually in terms of the base legal questions here. I mean, still you'd be asking the question, did Congress intend these statutes to apply extraterritorially? Well, when they define the United States, they do include the territories in there, correct? That they do, Your Honor. I don't believe that. So what do we make of that? Well, I think when you're looking at the one. I mean, the plain language on that, I mean, it would be included there as United States is defined there. I don't know if that's quite true, Your Honor. I'd respectfully disagree. All right. Well, the definition is pretty close to the Guantanamo Bay situation, isn't it? Oh, I would. I think U.S. exercised pretty total control over Subic and Clark. I have to respectfully disagree again, Your Honor. The Supreme Court, for instance, just last term in the Russell v. Bush case talked about Guantanamo Bay. But the Supreme Court emphasized there the presumption against extraterritoriality didn't apply because the United States exercised complete jurisdiction and control. Complete. If you look at the basis agreement that governed the conditions by which the United States operated Clark and Subic Bay, it's quite different. It's not close to complete jurisdiction and control. And if you read the basis agreement, that makes it quite clear. And we can talk about some of the provisions. For instance, there's a provision here. I'd just like to start with the plain language. Certainly. The plain language did include the Philippines at that time, correct? In 1992? No, I don't believe so, Your Honor. If you look at the definition of the United States in CERCLA, it talks about the several states of the United States, the District of Columbia, Puerto Rico, Virgin Islands. It goes on in that respect. I think when it's using the word territory, it's naturally read to mean political subdivisions of the United States, such as Puerto Rico and Guam. Not any area elsewhere within the world over the United States has any measure of control. If that were the case, then every embassy, for instance, in every country in the world the United States has would be subject to CERCLA, which I don't think is a reasonable intent to ascribe to Congress. And, again, even if that were a plausible reading, that's not enough. You have to look at the presumption against extraterritoriality. Congress has to have the affirmative intention clearly expressed. It's not enough that it's a plausible reading that it could be read to apply abroad. That's not enough. The Supreme Court has made that clear repeatedly in the Arabian American case. Where we're all over the world today, as you know, with bases and so forth, this applying CERCLA would certainly open up a Pandora's box, wouldn't it? It certainly would, Your Honor. And if that were Congress's intent, you would certainly expect to see some affirmative evidence of that. If not in the statutory language, at least in the legislative history, the plaintiffs cite no legislative history in support because, as far as we're aware at least, there is none. Congress's concern in enacting CERCLA and in enacting the Superfund Amendments in 1986 was domestic concerns. You think, Mr. Kim, even assuming CERCLA applies extraterritorially, you think it's a separate question of whether or not, say, you know, foreign nationals are those intended to be permitted to bring private action under CERCLA? I think it is a separate question, Your Honor. As we note in our brief, there's a special section within CERCLA, Section 111L, which addresses foreign claimants and claims by those people. And it sets forth particular conditions that foreign claimants must satisfy before they can bring claims under CERCLA. Now, are you familiar with this case Judge Bright mentioned from the Eastern District of Washington? I am familiar with it, Your Honor. It is a different situation from the situation we have here. There we have transboundary pollution. And as we described in a footnote in our brief, that situation is different because what we actually have is a release into the United States. So this application of the traditional law about applying the effects test? I believe so. And there's a particular case law regarding the definition of release under CERCLA. And this Court, as well as others, have consistently interpreted that term to refer not only to the initial introduction of contaminants into the environment, but also subsequent dispersal. So the fact that there is dispersal within the United States subsequent to the initial release could be read to mean that there's a release within the United States as well. Although you've focused primarily on the extraterritorial aspect, if the Court were to not decide that, your position is that you could also prevail on that these individuals could not state a claim under CERCLA. We haven't made that argument. I referred just a second ago to Section 111L. I should note for the Court's information that that just discusses a particular subset of claims. It uses the terms foreign claimant and claim, but those terms are defined specifically within CERCLA, Section 101 of CERCLA, to mean especially claims for damages. Plaintiffs here are not seeking damages, so we haven't contended, at least to this point, that that section directly controls the situation here. Well, can the Court resolve it that way, based on the posture that we have this case? I'm not sure, for both the reasons I just stated as well. It's not clear at this point exactly who the plaintiffs are. I note that Plaintiffs' Counsel said an argument there, in fact, Filipino citizens. At least I think I heard him say that. But that's not actually made clear in their complaint, and if we take the allegations in their complaint and make necessary inferences to see whether there is any set of facts that could be proven consistent with it to state a claim, we haven't made that argument yet for that reason. So obviously, if this Court were to disagree with the district court's reason, there is that as well as a plethora of other reasons why this suit shouldn't go forward. I've talked about CERCLA. I would note Section 105D, the provision they invoke, itself indicates that Congress was contemplating domestic action. It says that a subject of a preliminary assessment may have to be ranked against national priority releases. That, of course, indicates a Congress contemplated. We're talking about domestic releases. There's many other provisions within CERCLA that indicate that Congress was thinking domestically, and those are, of course, in our brief. I don't think it's necessary at this point to go forward on those. I can certainly also discuss international law. They attempt to invoke the Charming Betsy canon now. That attempt is uncounted for several reasons. First, they didn't do it in the district court, so it's waived. Second, the Charming Betsy shouldn't be read to extend the reach of domestic legislation into other countries. I mean, it's been used the opposite. Exactly, Your Honor. For the most part, correct? That's right. Your Honor, we know of no case in which the Charming Betsy canon, which is related to principles of comedy, could be used to extend domestic legislation into the affairs of another sovereign nation like the Philippines. We'd suggest that doesn't... I want to go back to the congressional intent on the clear evidence or the clear statement of where... As you understand it, what is the appellant's best argument on that, how that exists? Well, the argument that they emphasize is the one we discussed under JIRP, the Section 2701C, that this extends the reach of CERCLA where CERCLA wouldn't itself go. As I discussed, 2701C doesn't even impose any obligations. It merely talks about which is a particular official responsible for particular actions. And even if it did, it doesn't talk extraterritorially. It doesn't provide the affirmative intention of Congress clearly expressed. So that is what I believe the plaintiffs believe is their best argument, but I believe it's incorrect. Under CERCLA itself, I believe the plaintiffs think their best argument is the definition of the term environment and the fact that it refers to areas both within the United States and under the jurisdiction of the United States. For the manifold reasons we discussed in our brief, that doesn't indicate that Congress intended to apply CERCLA at areas within other sovereign nations. It is more reasonably read to encompass areas that are neither within the United States nor within other sovereign nations. That's a perfectly reasonable reading of the statute and, again, one that doesn't violate the presumption against extraterritoriality. All right. In terms of interpreting the language the way that the appellant would ask to have it interpreted, what do you see to be the implications and the reach of that? I think it would have a very far-reaching effect. As I indicated earlier, there are many different areas within the world over which the United States may have some degree of jurisdiction. Evidently, the plaintiffs would apply CERCLA at all of those, every United States embassy, every former military base. There may be other examples. I'm not really sure of the reach of the argument. Not only that, again, we're talking about military bases that were closed in return to the Philippines in 1992. Who knows how far back the plaintiffs would extend the reach of their argument temporally as well as geographically? Not only that, as we discussed in our brief, if, in fact, it were the case that these areas, these former military bases that were closed in 1992, were subject to the reach of CERCLA, it wouldn't just mean that the United States government would be subject to actions. It could mean that Filipino nationals would be subject to actions under CERCLA brought by other Filipino nationals, merely because those Filipino nationals who were defendants in that case caused the release of hazardous substances at Clark and Civic Bay, for instance, or any of the other manifold areas that could be subject to CERCLA. Now, the Supreme Court made clear in cases like the Arabian American case, and this Court made clear in the Suba Films case, it's just not reasonable to read a statute that way, to subject the United States and the United States courts to claims between Filipino nationals, between nationals of other countries, where the only nexus of the United States courts, the United States domestic legislation, is the fact that at some point in time, at some point in time, these areas were subject to some measure of control by the United States. That's just not reasonable. Give me an example of what you think would be clear evidence. Certainly. We actually cited one in our brief. 10 U.S.C. 2734 allows certain residents of foreign countries to bring claims against the Department of Defense for damages, property loss, injury related to non-combat activities. Actually, it says, for activities outside of the United States' territory and its possessions. I'm paraphrasing that. It's close to that. They notably don't seek to invoke that. They instead seek to invoke CERCLA, which doesn't say anything like that. Nor do they seek to invoke the provision in the basis agreement itself, which said that Filipino nationals could seek compensation from the Department of Defense. There's an article in the basis agreement that specifically sets that forth. They don't seek to invoke that either. Nor do they seek to invoke the diplomatic channels that most likely is the most appropriate way for them to seek relief here. When you're talking about the activities of a government within a second nation, pursuant to an intergovernmental agreement, you're talking about something within the realm of the political and diplomatic arms of the United States government. It is, with all due respect, not something that's appropriate for judicial resolution. So even if we were to agree with everything that the appellant says, what do you, I think Judge Teshima already asked this, I mean, what could we order anyone to do? That's very unclear to me. We haven't raised that argument yet since we're just at the stage of a failure to state a claim. Obviously, if this case got remanded, we'd need to consider issues just like that one. For all the reasons I've stated, as well as the reasons briefed, I respectfully submit the district court was correct. If there's any further questions the court has, I'd be happy to answer them. Otherwise, I'll cede the rest of my time. Well, no further questions. Thank you. Thank you very much. Your Honor, I'll try to respond just to a couple of points very briefly. The United States has argued that the DERP statute really is essentially does nothing.  And I think that runs contrary to the plain language there. The Section 2701C uses mandatory language, as the secretary shall carry out response actions in accordance with the provisions of DERP and CERCLA. I think that's creating an obligation to comply with CERCLA. And I respectfully disagree with that. Their characterization of that is simply assigning responsibility, if one otherwise exists, to the secretary of defense. As for the attempt to distinguish Pullen, the mere fact that we're talking about a criminal statute involving sexual misconduct there, the role of the court is the same in interpreting those statutes. It's a matter of reading the language of the statute and deciding what the language means. And the Pullen court found that language very similar to what's used in the DERP statute applied extraterritorially. We submit that was correct. The defendants hadn't suggested in their briefs otherwise, standing here now that they've suggested to you that they would disagree with it. We submit that it was correct. Pullen properly interpreted that statute. Finally, a point raised by Your Honors as to whether or not the CERCLA indicated, CERCLA has any indication that it did not intend foreign claimants to be able to bring a citizen suit under CERCLA. My clients have sued under Section 9659A of CERCLA, the citizen suit provision, which allows any person to bring a claim against any other person, including expressly the United States government. And I don't think there's any indication in the statute that Congress intended to preclude from the definition of the term a foreign resident. Well, but how do you, I know you've responded to some extent, but you obviously have to deal with a presumption against. How do you deal with that? Well, I think the presumption against, number one, comes from the fact that Congress in CERCLA didn't define the term environment in language that said, define the environment to include lands, waters, groundwaters, within the United States or under the jurisdiction of the United States. And so I think they were indicating there that either inside the United States or outside the United States under the jurisdiction of the United States. And that extraterritorial intent is made specific, particularly clear with respect to military bases under the jurisdiction of the Secretary of Defense by the DERP statute. So that's where the clear expression of intent to apply extraterritoriality really comes from, is the DERP statute that we've cited in our brief. Do you agree with the attorney for the government that if we were to interpret it your way that, I mean, he sort of listed a parade of horribles of all the lawsuits that we would be subjected to, every place where the U.S. has an embassy or whatever. Do you agree that following your reasoning that that would necessarily follow? It would depend on the particular grounds on which this Court found for us. But under the DERP statute, that statute is specific to facilities that are under the jurisdiction of the Secretary of Defense. So it wouldn't necessarily apply to State Department facilities, embassies, that type of thing. It would apply only specifically to military bases under the Secretary of Defense's jurisdiction. If we were to find that CERCLA, on the other hand, did apply extraterritoriality on its own terms, then it may have the effect that the government has suggested. We don't think it's necessarily a parade of horribles. Well, what about countries where we have troops right now? Well, it depends, again, on the degree of whether you could find that under the DERP statute, the area where the troops are located is owned by, leased to, or otherwise possessed by the government. And under the jurisdiction of the Secretary of Defense. And that's going to depend upon a fact-specific inquiry. Here we had bases agreements that clearly gave possession of the bases in the Philippines to the United States government and were under the jurisdiction of the Secretary of Defense. All right, thank you. Thank you very much. Thank you both, counsel, for your arguments. The matter will stand submitted. The Court's going to take a brief recess and we'll reconstitute for the next case in just a few minutes. All rise. Five minutes. Five minutes. Do you know where Claudia's office is? Claudia? You're supposed to go see her. First floor somewhere. Yeah, that's all I know. One corner's apparently still open. Four of those are open.  Thank you, Your Honor. I'm going to take a circle so I guess we can wander around normally. That should work. Thank you. Thank you. Thank you. Thank you. So it actually is cold in New York. Yeah. Okay.
judges: Bright, Tashima, Callahan